AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>Apple, Inc., One Infinite Loop, Cupertino, California<br>95014 (jdpjazzy891@gmail.com) | )<br>)<br>)<br>)<br>)<br>)     Case No.   **20-mj-3382** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 952, 960, 963 | Importation of a Controlled Substance and Conspiracy |

The application is based on these facts:

See Attached Affidavit of Homeland Security Investigations Special Agent Nicholas Lawlor, incorporated herein by reference.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Nicholas Lawlor*

*Applicant's signature*

Special Agent Nicholas Lawlor, HSI

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date: _____ August 14, 2020 _____

*Allison H. Goddard*

*Judge's signature*

City and state: San Diego, California

Hon. Allison H. Goddard

*Printed name and title*

**AFFIDAVIT**

I, Nicholas Lawlor, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple Inc. (hereafter "Apple") to disclose to the government records and other information, including the contents of communications, associated with the Apple ID: **jdpjazzy891@gmail.com** using IMSI 310260169866915; Wi-Fi MAC address 54:2B:8D:66:2D:A2; and phone number (909) 756-6793, that is stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at 1 Infinite Loop, Cupertino, CA. The information to be disclosed by Apple and searched by the government is described in the following paragraphs and in Attachments A and B.

2.     I am a Special Agent (SA) with Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), and have been employed by ICE/HSI since January of 2017. I am a graduate of the Uniformed Police Training Program (UPTP), the Criminal Investigator Training Program (CITP), and the Homeland Security Investigations Special Agent Training (HSISAT) program at the Federal Law Enforcement Training Center (FLETC) in Brunswick, Georgia. I am also a graduate of the United States Secret Service (USSS) Uniformed Division Officer Training Course (UDTC) program at the USSS James J. Rowley Training Center located in Laurel, Maryland. My duties include investigating the trafficking of illicit controlled substances and the importation and distribution of illegal substances.

3.     During the course of my training at FLETC, I learned fundamentals of how to conduct criminal investigations including, but not limited to, gathering of evidence, preservation of a crime scene, and use of electronic evidence – all in relation to violations of the United States Code. I have participated in training related to controlled substances, including but not limited to marijuana, cocaine, methamphetamine, heroin, and fentanyl.

I have also received training in the methods used by illicit drug traffickers to import, distribute, package, and conceal controlled substances

4.     Prior to my current position with HSI, I was a Uniformed Division Officer with the United States Secret Service in Washington, D.C. and was assigned to work at the White House.  I am presently assigned to the Homeland Security Investigations (HSI) Deputy Special Agent in Charge (DSAC), San Ysidro, California Office, and my duties entail investigating the smuggling of controlled substances, and merchandise into and out of the United States of America.  As an HSI Special Agent, I have received training in illicit drug enforcement and participated in numerous criminal investigations involving the shipments and smuggling of various kinds of contraband; including illicit drugs and other prohibited items into and out of the United States.

5.     During my tenure with HSI, I have participated in numerous arrests of persons for violating the Controlled Substances Act and have participated in the investigation of various drug trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California. Through interviews, I have gained a working knowledge and insight into the methodology on controlled substance traffickers as they attempt to smuggle illicit drugs into the United States.

6.     Through my training, experience, and conversations with other members of law enforcement, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at the Ports of Entry.  I am aware that it is common practice for illicit drug smugglers to work in concert with other individuals and to do so by utilizing cellular telephones. Because they are mobile, the use of cellular telephones permits illicit drug traffickers to easily carry out various tasks related to their trafficking activities, including, *e.g.*, remotely monitoring the progress of their contraband while it is in transit, providing instructions to drug couriers, warning accomplices about law enforcement activity, and

communicating with co-conspirators who are transporting narcotics and/or proceeds from narcotics sales.

7.     In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of narcotics investigations, and the opinions stated below are shared by them.  Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit.

8.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

9.     Based on the facts as set forth in this affidavit, there is probable cause to believe that the information described in Attachment A contains evidence of violations of Title 21, United States Code Sections 952, 960 and 963, as described in Attachment B.

## JURISDICTION

10.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

11.     On November 25, 2019, at approximately 11:51 P.M., Jazmine Denise DUARTE ("DUARTE") and Destiny Raylene RICHARDS ("RICHARDS"), both United States Citizens, entered the United States from Mexico through the San Ysidro Port of Entry.  DUARTE was the driver and RICHARDS was the passenger of a gray 2003 Ford Focus ("the vehicle") bearing California license plates. DUARTE told CBP officer they were traveling to San Diego, CA, and provided two negative Customs declarations.  In secondary inspection, CBPOs found approximately 33 packages inside the vehicle's rear quarter panels.  Thirty (30) of the packages contained methamphetamine with a total

weight of approximately 14.96 kilograms. The remaining 3 packages contained fentanyl, with a total weight of 3.28 kilograms.

12.     Officers placed DUARTE and RICHARDS under arrest for violating Title 21 United States Code, Sections 952 and 960, Unlawful Importation of Controlled Substances.   An Indictment charging DUARTE and RICHARDS with importation of methamphetamine and fentanyl was filed on December 19, 2019, in case No. 19CR5153-JM.  A motion hearing is set before the Honorable Jeffrey T. Miller on October 16, 2020.

13.     At the time of her arrest, DUARTE was in possession of a red Apple iPhone XR (PRODUCT) RED cell phone with cracked front and rear screen protector. The phone was seized under FPF No. 2020250400046301. On January 10, 2020, I applied for, and Magistrate Judge Mitchell D. Dembin signed a search warrant (20MJ0098), authorizing the search of DUARTE's iPhone XR for the time period from September 25, 2019, through November 26, 2019.  I hereby adopt and incorporate this search warrant, including my affidavit in support thereof, as part of my affidavit to search the iCloud account associated with DUARTE's iPhone.

14.     DUARTE's phone was forensically downloaded pursuant to 20MJ0098 on March 4, 2020.  According to the report prepared by Computer Forensics Agent Eric Sajo, the number associated with DUARTE's iPhone is (909) 756-6793.  (DUARTE provided the same phone number on her personal history report after her arrest.)

15.     I requested and received account information from the phone provider T-Mobile regarding (909) 756-6793, the phone number provided by DUARTE and confirmed by forensic extraction of the iPhone seized from DUARTE.  According to T-Mobile, the subscriber name for that number is Jazmine D. Duarte, with activation date of November 13, 2016.  Based on the data provided by T-Mobile, DUARTE's phone was receiving and sending calls and messages during the time period from September 25, 2019, through November 26, 2019.

16. According to Agent Sajo's report, DUARTE's phone was PIN locked, and not supported for passcode brute force extraction. CFA Sajo was able to obtain a partial extraction of unencrypted data. The available extraction confirmed that DUARTE's phone received voicemails between September 25, 2019, and the date of her arrest. Additionally, "Installed Applications" on DUARTE's iPhone contain data from Facebook and Facebook Messenger. DUARTE had 622 Facebook "contacts," including Destiny RICHARDS, who was arrested in the same case. According to the available extraction, DUARTE had an iCloud account associated with Apple ID **jdpjazzy891@gmail.com**. (DUARTE provided the same email address on her personal history report after her arrest.)

17. In this case, DUARTE was arrested on November 25, 2019, at the San Ysidro Port of Entry as the driver of a vehicle that contained methamphetamine and fentanyl. DUARTE's crossing history shows that on November 1, 2019, DUARTE crossed in a Toyota Corolla. Several days later, on November 5, 2019, another driver was arrested at San Ysidro POE for bringing 15 kilograms of methamphetamine in that Toyota's gas tank. Based upon my experience investigating narcotics traffickers and the particular facts of this case, as described more fully in the affidavit in support of the search warrant for DUARTE's phone, I believe DUARTE, and other co-conspirators were engaged in a conspiracy to smuggle narcotics into the United States from Mexico. I also believe the co-conspirators, including DUARTE, used cellular phones to communicate and coordinate the importation of narcotics.

18. Based on the partial download of the phone and the T-Mobile records, I believe that DUARTE used an iPhone, and an associated iCloud account, during the relevant period of time from September 25, 2019, until her arrest on November 25, 2019. Unless disabled by a sophisticated user, iCloud accounts are automatically created and information automatically backed up. Information on someone's iPhone is automatically backed up to their iCloud account.

19.     Based upon my experience investigating narcotics traffickers, I believe DUARTE used her iPhone, including the various applications installed on the iPhone, to communicate with her co-conspirators about the drug smuggling activities.  I further believe that evidence of DUARTE's drug trafficking (such as iMessages, text messages, and Facebook Messenger communications, photos, videos, locations, and contacts) may be stored in her iCloud account.

20.     Additionally, it is believed that the records are still available to Apple as a request to preserve was made under 18 U.S.C. § 2703(f).

## INFORMATION REGARDING APPLE ID AND iCLOUD

21.     Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

22.     Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

a.     Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.     iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c.     iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

d.     iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected

6

device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e.     Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f.     Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

g.     Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

h.     App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

23.     Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

24.     An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

25.     Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

26.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on

Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

27.     Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

28.     Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail

messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

29.     In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

30.     For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

31.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access

the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

32.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

33.     Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

34.     Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

**PROCEDURES FOR ELECTRONICALLY-STORED INFORMATION**

35.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

36.    Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The ISP's personnel are not. It would be inappropriate and impractical for federal agents to search the ISP's vast computer network for the relevant accounts and then to analyze the contents of those accounts on the ISP's premises. The impact on its business would be disruptive and severe.

37.    Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from the subject ISP accounts, as described in Attachment B. In order to accomplish the objective of the search warrant with a minimum of interference with the ISP's business activities, to protect the privacy of its subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, agents seek authorization to allow the ISP to make digital copies of the entire contents of the accounts subject to seizure. Those copies will be provided to me or to an authorized federal agent. The copy will be imaged and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachment B. Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

38.    Analyzing the data to be provided by the ISP may require special technical skills, equipment, and software. It may also be time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang or typographical errors. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Attachments to electronic mail messages

12

are often in proprietary formats that do not store data as searchable text.  Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. Internet Service Providers like Microsoft and Google do not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

39.    Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months.   Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination of the ISPs' records will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

40.    Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic communications that identify any users of the subject account and any electronic communications sent or received in temporal proximity to incriminating messages that provide context to the incriminating communications.

41.    All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

**CONCLUSION**

42.    Based on the forgoing, I request that the Court issue the proposed search warrant.

43.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

I swear the foregoing is true and correct to the best of my knowledge and belief.

*Nicholas Lawlor*

Special Agent Nicholas Lawlor
HSI Special Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this ____ 14th day of ____ August ____, 2020.

_____
The Honorable Allison H. Goddard
United States Magistrate Judge

14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ATTACHMENT A

Apple Inc. is an Internet Service Provider with its primary computer information systems and other electronic communications and storage systems, records, and data located at One Infinite Loop, Cupertino, California, 95014.

## ATTACHMENT B

**I.**   Service of Warrant

The officer executing the warrant shall permit Apple Inc. (the ISP), as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

**II.**   Items subject to seizure from the ISP

a. All subscriber and/or user information, all electronic mail, files, cloud storage, location information, search history, images, text messages, voicemail, histories, buddy or friend lists, contacts, iCloud Drives, iCloud files, iCloud Backup and Restore, photos, notes, videos, calendars, messages profiles, methods of payment, detailed billing records, access logs, transactional data and any other files or records for:

**jdpjazzy891@gmail.com**

IMSI 310260169866915

Wi-Fi MAC address 54:2B:8D:66:2D:A2

(909) 756-6793

**III.**   The search of the data supplied by the ISPs pursuant to this warrant will be conducted by the Homeland Security Investigations as provided in the "Procedures For Electronically-Stored Information" section of the affidavit submitted in support of this search warrant and will be limited to evidence of violations of 21 U.S.C. Sections 952, 960 and 963 involving Jazmine Denise DUARTE for the period of September 25, 2019, up to and including November 26, 2019, and to seizure of:

a. Communications, records, attachments, files, and data tending to discuss or suggest efforts to import methamphetamine, fentanyl, or some other federally controlled substance from Mexico into the United States, or possess and/or transport with the intent to distribute federally controlled substances within the United States;

16

b.  Communications, records, attachments, files, and data tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, fentanyl, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

c.  Communications, records, attachments, files, and data tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, fentanyl, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

d.  Communications, records, attachments, files, and data tending to identify travel to or presence at locations involved in the importation of methamphetamine, fentanyl, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substance within the United States, such as stash houses, load houses, or delivery points; and

e.  Communications, records, attachments, files, and data tending to identify the user(s) of the subject accounts, and any co-conspirators involved in the activities in III(a)-(d) above;

f.  Communications, records, attachments, files, and data that provide context to any communications or records described above, such as messages sent or received in temporal proximity to any relevant electronic communications and any electronic communications tending to identify users of the subject accounts;

**which are evidence of violations of Title 21 U.S.C. §§ 952, 960 and 963 (conspiracy to import and importation of controlled substances).**

17

NOT FOR PUBLIC VIEW

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>One red Apple iPhone XR (PRODUCT) RED cell phone<br>with cracked front and rear screen protector seized<br>under FPF No. 2020250400046301 | )<br>)<br>)   Case No.   20MJ0098<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Southern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, incorporated herein by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B-1, incorporated herein by reference.

**YOU ARE COMMANDED** to execute this warrant on or before ___1/24/2020___ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.      ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Hon. Mitchell D. Dembin _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   1/10/2020  9:20am

_____
*Judge's signature*

City and state:      San Diego, CA

Hon. Mitchell D. Dembin
*Printed name and title*

**MITCHELL D. DEMBIN
U.S. MAGISTRATE JUDGE**

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| | | |
|---|---|---|
| **Return** | | |
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date:  _____

_____

*Executing officer's signature*

Special Agent Nicholas Lawlor, HSI

*Printed name and title*

## **ATTACHMENT A-1**

### PROPERTY TO BE SEARCHED

One red Apple iPhone XR (PRODUCT) RED cell phone with cracked front and rear screen protector seized under FPF No. 2020250400046301

### (TARGET TELEPHONE #1)

currently in the possession of Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations, Office of the Deputy Special Agent in Charge, at the San Ysidro Evidence Vault at 2255 Niels Bohr Court, San Diego, California 92154.

## **ATTACHMENT B-1**
### ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephone described in Attachment A-1 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below. The seizure and search of the cellular/mobile telephone shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of September 25, 2019, up to and including November 26, 2019.

a. tending to indicate efforts to import methamphetamine, fentanyl, or some other federally controlled substance from Mexico into the United States, or possess and/or transport with the intent to distribute federally controlled substances within the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, fentanyl, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, fentanyl, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, fentanyl, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substance within the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the subject telephone; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 952, 960 and 963.

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of California

FILED

JAN 10 2020

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

One red Apple iPhone XR (PRODUCT) RED cell phone
with cracked front and rear screen protector seized
under FPF No. 2020250400046301

)
)
)
)
)
)

Case No.    20MJ0098

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-1, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 952, 960, 963 | Importation of a Controlled Substances; Conspiracy to Import Controlled Substances |

The application is based on these facts:

See attached Affidavit of Special Agent Nicholas Lawlor

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Nicholas Lawlor, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1/10/2020

City and state: San Diego, CA

_____
*Judge's signature*

Hon. Mitchell D. Dembin
MITCHELL D. DEMBIN
U.S. MAGISTRATE JUDGE

## AFFIDAVIT IN SUPPORT OF APPLICATION
## FOR SEARCH WARRANTS

I, Nicholas Lawlor, being duly sworn, hereby depose and state as follows:

## INTRODUCTION

1.     I make this affidavit in support of an application for search warrants in furtherance of a narcotics smuggling investigation conducted by Department of Homeland Security, Homeland Security Investigations Special Agents for the following electronic devices:

    a.   One red Apple iPhone XR (PRODUCT) RED cell phone with cracked front and rear screen protector seized under FPF No. 2020250400046301 (TARGET TELEPHONE # 1), described in Attachment A-1 (incorporated herein by reference);

    b.   One silver Apple iPhone 7S Model: A1687 with cracked front screen, FCC ID: BCG-E2944A, seized under FPF No. 2020250400046302 (TARGET TELEPHONE # 2), described in Attachment A-2 (incorporated herein by reference);

(collectively the "TARGET TELEPHONES"), which were seized from Jazmine Denise DUARTE ("DUARTE") and Destiny Raylene RICHARDS ("RICHARDS") on or about November 26, 2019, incident to their arrest for importation of methamphetamine and fentanyl at the San Ysidro, California Port of Entry.

2.     TARGET TELEPHONE #1 was seized from Jazmine DUARTE.  TARGET TELEPHONE #2 was seized from Destiny RICHARDS.

3.     The TARGET TELEPHONES are currently in the possession of the Department of Homeland Security, Homeland Security Investigations, 2255 Niels Bohr court, San Diego, CA 92154 (Seized Property Vault).

4.     I seek authority to search the TARGET TELEPHONES for evidence of crimes, specifically, violations of Title 21, United States Code, Sections 952, 960 and 963,

1   as described in Attachments B-1 and B-2 (incorporated herein by reference) for the time
2   period from September 25, 2019, through November 26, 2019.

### TRAINING AND EXPERIENCE

4       5.    I am a Special Agent and currently employed with the United States
5   Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE),
6   Homeland Security Investigations (HSI). I have held my current position with HSI since
7   January of 2017. I am a graduate of the Uniformed Police Training Program (UPTP), the
8   Criminal Investigator Training Program (CITP), and the Homeland Security Investigations
9   Special Agent Training (HSISAT) program at the Federal Law Enforcement Training
10  Center (FLETC) in Brunswick, Georgia. I am also a graduate of the United States Secret
11  Service (USSS) Uniformed Division Officer Training Course (UDTC) program at the
12  USSS James J. Rowley Training Center located in Laurel, Maryland.

13      6.    During the course of my training at FLETC, I learned fundamentals of how
14  to conduct criminal investigations including, but not limited to, gathering of evidence,
15  preservation of a crime scene, and use of electronic evidence – all in relation to violations
16  of the United States Code. I have participated in training related to controlled substances,
17  including but not limited to marijuana, cocaine, methamphetamine, heroin, and fentanyl. I
18  have also received training in the methods used by illicit drug traffickers to import,
19  distribute, package, and conceal controlled substances

20      7.    Prior to my current position with HSI, I was a Uniformed Division Officer
21  with the United States Secret Service in Washington, D.C. and was assigned to work at the
22  White House. I am presently assigned to the Homeland Security Investigations (HSI)
23  Deputy Special Agent in Charge (DSAC), San Ysidro, California Office, and my duties
24  entail investigating the smuggling of controlled substances, and merchandise into and out
25  of the United States of America. As an HSI Special Agent, I have received training in
26  illicit drug enforcement and participated in numerous criminal investigations involving the

27
28  AFFIDAVIT IN SUPPORT OF APPLICATION    2
    FOR SEARCH WARRANTS

shipments and smuggling of various kinds of contraband; including illicit drugs and other prohibited items into and out of the United States.

8.      During my tenure with HSI, I have participated in numerous arrests of persons for violating the Controlled Substances Act and have participated in the investigation of various drug trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California.   Through interviews, I have gained a working knowledge and insight into the methodology on controlled substance traffickers as they attempt to smuggle illicit drugs into the United States.

9.      Through my training, experience, and conversations with other members of law enforcement, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at the Ports of Entry.   I am aware that it is common practice for illicit drug smugglers to work in concert with other individuals and to do so by utilizing cellular telephones. Because they are mobile, the use of cellular telephones permits illicit drug traffickers to easily carry out various tasks related to their trafficking activities, including, e.g., remotely monitoring the progress of their contraband while it is in transit, providing instructions to drug couriers, warning accomplices about law enforcement activity, and communicating with co-conspirators who are transporting narcotics and/or proceeds from narcotics sales.

10.    In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of narcotics investigations. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit.

11.    Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in controlled substance smuggling

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANTS

3

investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

      a.    Drug smugglers will use cellular telephones because they are mobile and they have instant access to telephone calls, text, WhatsApp and other texting applications, the internet, video, social networking sites, and voice messages;

      b.    Drug smugglers will use WhatsApp and other encrypted texting applications on cellular telephones to communicate because they believe that these services insulate their communications from law enforcement;

      c.    Drug smugglers will use cellular telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

      d.    Drug smugglers and their accomplices will use cellular telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

      e.    Drug smugglers will use cellular telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

      f.    Drug smugglers will use cellular telephones to notify or warn their accomplices of law enforcement activity including the presence and location of marked and unmarked units, as well as the operational status of Border Patrol checkpoints.

      g.    Drug smugglers will use cellular telephones to communicate with each other regarding payment and other financial arrangements relating to the transportation of their illegal cargo.

      8.    Based upon my training and experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party

applications, photographs, audio files, videos, and location data.  This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone.  Specifically, I know based upon my training, education, and experience investigating these conspiracies that searches of cellular telephones yields evidence:

a.     tending to identify attempts to import methamphetamine, fentanyl, or some other controlled substance from Mexico into the United States;

b.     tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the smuggling of methamphetamine, fentanyl, or some other controlled substance from Mexico into the United States;

c.     tending to identify payment, payment methods, or other monetary transactions relating to importing controlled substances from Mexico to the United States;

d.     tending to identify co-conspirators, criminal associates, or others involved in smuggling methamphetamine, fentanyl, or some other controlled substance from Mexico into the United States;

e.     relating to the purchase of vehicles to import methamphetamine, fentanyl, or some other controlled substance from Mexico into the United States;

f.     tending to identify travel to or presence at locations involved in the smuggling of methamphetamine, fentanyl, or some other controlled substance from Mexico into the United States, such as stash houses, load houses, or delivery points;

g.     tending to identify the user of, or persons with control over or access to, the subject telephones; and/or

h.     tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANTS

5

12.    The facts set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; interviews; my review of documents related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; conversations with other agents experienced in controlled substance investigations, and information gained through my training and experience.  All the dates, times, and amounts listed in this affidavit are approximate. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for search warrants, it does not set forth each and every fact that I or others have learned during the course of this investigation.

## FACTS SUPPORTING PROBABLE CAUSE

13.    On November 25, 2019, at approximately 11:51 P.M., Jazmine Denise DUARTE ("DUARTE") and Destiny Raylene RICHARDS ("RICHARDS"), both United States Citizens, applied for entry into the United States from Mexico through the San Ysidro Port of Entry in vehicle #3.  DUARTE was the driver and RICHARDS was the passenger of a gray 2003 Ford Focus ("the vehicle") bearing California license plates.  A Customs and Border Protection Officer (CBPO) in primary inspection asked where DUARTE was traveling and she stated San Diego, CA.  The CBPO received two negative Customs declarations.  When CBPO asked what they were doing in Mexico, DUARTE responded that they went to make quick money by dancing.

14.    During the inspection, the CBPO noticed that the vehicle smelled of marijuana.  The CBPO also received a computer-generated alert.  Based on the alert and the marijuana smell, DUARTE, RICHARDS, and the vehicle were referred to secondary for further inspection.  The primary officer observed that while traveling to the secondary inspection, the vehicle attempted to drive away from the area and had to be re-directed to the secondary inspection lot.

15.     In secondary inspection, a CBP K-9 alerted to the narcotic odor emanating from the interior driver side rear quarter panel of the vehicle.  The vehicle was screened via a Z-Portal and CBPOs observed anomalies inside both the driver and passenger rear quarter panels.  CBPOs then found approximately 33 packages inside the natural voids of the vehicle's rear quarter panels.  Thirty (30) of the packages had a total weight of approximately 14.96 kilograms (32.98 pounds) and contained substance that preliminarily tested positive for methamphetamine. The remaining 3 packages contained substance that preliminarily tested positive for fentanyl, with a total weight of 3.28 kilograms (7.23 pounds).

16.     Officers placed DUARTE and RICHARDS under arrest for violating Title 21 United States Code, Sections 952 and 960, Unlawful Importation of Controlled Substances. At the time of their arrest, DUARTE was in possession of TARGET TELEPHONE #1, and RICHARDS was in possession of TARGET TELEPHONE #2.  Officers seized the TARGET TELEPHONES incident to their arrest.

17.     An Indictment charging DUARTE and RICHARDS with importation of methamphetamine and fentanyl was filed on December 19, 2019, in case No. 19CR5153-JM.  A motion hearing is set before the Honorable Jeffrey T. Miller on January 24, 2020.

18.     Post-arrest, DUARTE waived her *Miranda* rights and elected to make a statement.  DUARTE denied knowledge of the drugs.  DUARTE stated she traveled to Tijuana, Mexico at approximately 7:00 p.m. to dance at a club.  DUARTE stated her friend "Mike" told her about the club. DUARTE also stated she had danced a couple times a month since October 2019, and has made approximately $2000 U.S. dollars.  DUARTE stated she danced for approximately three hours and made no money on November 25, 2019.

19.     DUARTE stated she left the vehicle parked at a gas station/pharmacy in Tijuana and took a taxi to the dance club. DUARTE stated the car was registered to her

uncle. DUARTE stated she went to the casino after she and RICHARDS were done dancing. DUARTE stated she had one drink at the casino and that no one else was with them. DUARTE stated she was driving to San Diego to stay at her husband's house in San Diego, CA.

20.    RICHARDS waived her *Miranda* rights and elected to make a statement. RICHARDS also denied knowledge of the drugs. RICHARDS stated that DUARTE is her friend. According to RICHARDS, DUARTE asked her to go along on a trip to DUARTE's family in Tijuana because it was DUARTE's birthday on November 27, 2019. RICHARDS stated DUARTE parked the vehicle at her aunt and uncle's house, in front of the driveway, and went to the casino by the hotel to have a drink. RICHARDS further stated they got a ride to the casino from some people DUARTE either knew or had just met there. RICHARDS claimed they stayed at the casino for about an hour.

21.    According to RICHARDS, DUARTE's aunt arranged an interview for them at a club in Tijuana. RICHARDS explained that she has known DUARTE since the 9th grade, and the two women "do bottle service and dance together." RICHARDS claimed the two women are best friends and to her knowledge, do not keep secrets from each other.

22.    RICHARDS said she and DUARTE were going to Tijuana to get a dance gig at a club, and brought their dance outfits with them. RICHARDS stated they were planning to stay until the next day and find out more about the gig in the morning. She could not explain why they left earlier if they were supposed to come back the following day. She claimed they decided to go out and have a drink since they had time, and to celebrate DUARTE's birthday. RICHARDS claimed they were somewhat familiar with Tijuana because they had visited Mexico before.

23.    RICHARDS stated they were at the casino for approximately an hour and two guys approached them. RICHARDS stated their names were "Jr" and "Mike" or "Mick," she could not recall. RICHARDS claimed that after having a drink, they left and went back

8

1   to DUARTE's aunt's house.   DUARTE went inside the house to talk to her aunt.

2   RICHARDS felt tired and fell asleep in the car.

3       24.   RICHARDS further stated they were supposed to come back to San Diego,

4   CA the next day but ended up coming back the night of November 25, 2019. RICHARDS

5   stated she was sleeping in the back seat of the vehicle on the way into Mexico as well as

6   on the way into the United States through the San Ysidro Port of Entry.

7       25.   The crossing history for the 2003 Ford shows that the vehicle crossed

8   southbound from the United States into Mexico on November 16, 2019, at approximately

9   10:09 p.m., at the San Ysidro Port of Entry.  It appears that an unknown male driver was

10   the sole occupant at the time of that crossing.  The only northbound crossing for the vehicle

11   was the night of the arrest in this case on November 25, 2019.

12       26.   A copy of California vehicle registration seized from the vehicle showed

13   "Simona Estrada" was the registered owner with an address in Norwalk, CA.  The vehicle

14   registration card had an expiration date of April 2, 2019.  A copy of California proof of

15   insurance card found in the vehicle showed "Simona Estrada Mnteon" and "Gloria Flores

16   Castel" as the insured and additional driver for the vehicle.  The effective coverage dates

17   for the insurance policy were from March 30, 2018, until March 30, 2019.

18       27.   A crossing history for DUARTE and RICHARDS shows that they crossed

19   into the United States together on May 3, 2019, in a different vehicle with CA plates

20   6XUX638.  That vehicle appears to be registered to Kenneth Salter, and he was the third

21   individual in the vehicle at the time of that crossing.  RICHARDS did not have any

22   crossings after May 3 until November 25, 2019, resulting in her arrest.

23       28.   DUARTE subsequently crossed into the United States in 2 different cars.  On

24   October 27, 2019, at 9:43 p.m., DUARTE crossed as the driver and sole occupant of a

25   vehicle with California plates 8HVF815.  That vehicle went southbound into Mexico on

26   October 26, 2019, at 2:47 a.m.  DUARTE also crossed in a 2003 Toyota Corolla with

27

28   AFFIDAVIT IN SUPPORT OF APPLICATION
    FOR SEARCH WARRANTS

California plates 5BNB447 on November 1, 2019, at 6:37 a.m. On November 5, 2019, another driver was arrested at San Ysidro POE for bringing 15 kilograms of methamphetamine in that Toyota's gas tank.

29.     Based upon my experience and investigation in this case, I believe that DUARTE, RICHARDS, as well as other persons as yet unknown, were involved in an on-going conspiracy to import methamphetamine, fentanyl, or some prohibited narcotics. Based on my experience investigating narcotics smugglers, I also believe that DUARTE and RICHARDS may have used the TARGET TELEPHONES to coordinate with co-conspirators regarding the importation and delivery of the methamphetamine and fentanyl, and to otherwise further this conspiracy both inside and outside the United States. I also know that recent calls made and received, telephone numbers, contact names, electronic mail (email) addresses, appointment dates, text messages, messages sent via texting applications such as WhatsApp, email messages, messages and posts from social networking sites like Facebook, photographs, videos, and other digital information are stored in the memory of cellular telephones which identify other persons involved in narcotics trafficking activities.

30.     Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the narcotics smuggling activities of DUARTE, RICHARDS, and their co-conspirators, such as telephone numbers, made and received calls, contact names, electronic mail (email) addresses, appointment dates, email messages, text messages, messages from texting applications like WhatsApp, messages and posts from social networking sites like Facebook, photographs, videos, and other digital information are stored in the memory of the cellular telephone described herein. Because the TARGET TELEPHONES have been

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANTS

10

1  in the custody of HSI since the date of DUARTE's and RICHARDS's arrest, I believe that

2  this information continues to be stored on the TARGET TELEPHONES.

3      31.  Drug trafficking conspiracies require intricate planning and coordination.

4  This often occurs days, weeks, or even months prior to the actual importation of the drugs

5  into the United States. Co-conspirators communicate with one another in efforts to ensure

6  success in getting their valuable cargo to its destination within the United States. In this

7  case, evidence supports that probable cause exists to search the TARGET TELEPHONES

8  for information dating back to September 25, 2019, which is approximately two months

9  before the crossing that resulted in arrest in this case on November 25, 2019.

10  ## SEARCH METHODOLOGY

11      19.  It is not possible to determine, merely by knowing the cellular telephone's

12  make, model and serial number, the nature and types of services to which the device is

13  subscribed and the nature of the data stored on the device. Cellular devices today can be

14  simple cellular telephones and text message devices, can include cameras, can serve as

15  personal digital assistants and have functions such as calendars and full address books and

16  can be mini-computers allowing for electronic mail services, web services and rudimentary

17  word processing. An increasing number of cellular service providers now allow for their

18  subscribers to access their device over the internet and remotely destroy all of the data

19  contained on the device. For that reason, the device may only be powered in a secure

20  environment or, if possible, started in "flight mode" which disables access to the network.

21  Unlike typical computers, many cellular telephones do not have hard drives or hard drive

22  equivalents and store information in volatile memory within the device or in memory cards

23  inserted into the device. Current technology provides some solutions for acquiring some

24  of the data stored in some cellular telephone models using forensic hardware and software.

25  Even if some of the stored information on the device may be acquired forensically, not all

26  of the data subject to seizure may be so acquired. For devices that are not subject to

27
28  AFFIDAVIT IN SUPPORT OF APPLICATION
      FOR SEARCH WARRANTS

11

1  forensic data acquisition or that have potentially relevant data stored that is not subject to
2  such acquisition, the examiner must inspect the device manually and record the process
3  and the results using digital photography. This process is time and labor intensive and may
4  take weeks or longer.

5      20.    Following the issuance of this warrant, I will collect the subject cellular
6  telephone and subject it to analysis. All forensic analysis of the data contained within the
7  telephone and its memory cards will employ search protocols directed exclusively to the
8  identification and extraction of data within the scope of this warrant.

9      21.    Based on the foregoing, identifying and extracting data subject to seizure
10 pursuant to this warrant may require a range of data analysis techniques, including manual
11 review, and, consequently, may take weeks or months. The personnel conducting the
12 identification and extraction of data will complete the analysis within ninety (90) days of
13 the date the warrant is signed, absent further application to this court.

14                          **CONCLUSION**

15     22.    Based on all of the facts and circumstances described above, there is probable
16 cause to believe that DUARTE and RICHARDS used the TARGET TELEPHONES to
17 facilitate the offenses of importing methamphetamine or other federally-controlled
18 substances. The TARGET TELEPHONES were likely used to facilitate the offenses by
19 transmitting and storing data, which constitutes evidence and instrumentalities of
20 violations of Title 21, United States Code, Sections 952, 960 and 963.

21     23.    There is also probable cause to believe that evidence and instrumentalities of
22 illegal activity committed by DUARTE and RICHARDS continues to exist on the
23 TARGET TELEPHONES.

24     24.    Based upon my experience and training, consultation with other agents in
25 narcotics investigations, consultation with other sources of information, and the facts set
26 forth herein, I know that the items to be seized set forth in Attachments B-1 and B-2

27
28  AFFIDAVIT IN SUPPORT OF APPLICATION          12
    FOR SEARCH WARRANTS

1  (incorporated herein) are likely to be found in the property to be searched described in

2  Attachments A-1 and A-2 (incorporated herein).  Therefore, I respectfully request that the

3  Court issue a warrant authorizing me or another federal law enforcement agent specially

4  trained in digital evidence recovery, to search the items described in Attachments A-1

5  through A-2, and seize the items listed in Attachments B-1 through B-2.

6

7                                            NICHOLAS LAWLOR
                                            HSI Special Agent
8

9  Subscribed and sworn to before me this  /0  day of January, 2020.

10

11

12                                            HON. Mitchell D. Dembin
                                            United States Magistrate Judge
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  AFFIDAVIT IN SUPPORT OF APPLICATION          13
    FOR SEARCH WARRANTS

## **ATTACHMENT A-1**

## PROPERTY TO BE SEARCHED

One red Apple iPhone XR (PRODUCT) RED cell phone with cracked front and rear screen protector seized under FPF No. 2020250400046301

(TARGET TELEPHONE #1)

currently in the possession of Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations, Office of the Deputy Special Agent in Charge, at the San Ysidro Evidence Vault at 2255 Niels Bohr Court, San Diego, California 92154.

## ATTACHMENT B-1
### ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephone described in Attachment A-1 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below.  The seizure and search of the cellular/mobile telephone shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of September 25, 2019, up to and including November 26, 2019.

a. tending to indicate efforts to import methamphetamine, fentanyl, or some other federally controlled substance from Mexico into the United States, or possess and/or transport with the intent to distribute federally controlled substances within the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, fentanyl, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, fentanyl, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, fentanyl, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substance within the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the subject telephone; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 952, 960 and 963.